## Flannery et al. v. Kelly.

Feb. 27, 1945.

J. M. Wolfinbarger for appellants.

Shumate & Shumate for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—Affirming.

In petition filed by Kelly against appellants he alleged ownership of a described tract of land, and charged that appellants were committing acts of trespass by building a fence which he claims cut off his use of a certain roadway and claiming to be the owners of the particular portion of his land. He asked for damages, perpetual injunction and a quieting of title.

Appellants did not dispute Kelly's title, but in answer denied that they had committed any acts of trespass. On submission the chancellor granted injunctive relief without damages. Parties stipulated in substance that prior to 1915 Charlie Harris owned a tract of land, shown on an exhibited map as tracts 1, 2 and 3. In 1915 he sold No. 3 to Henry Flannery, the husband of Mary E. and father of Robert, the appellants. The last three calls in the description were: "Thence around with the cliff to an ash and hickory; thence with Charlie Harris' line to a stone in the low gap; thence with Charlie Harris' line; thence to the gap in the cliff to the beginning."

In 1919 Harris sold the remainder, tracts 1 and 2, to William Plowman. In that deed we take what was in part a comparative course in the Harris to Flannery deed to be "thence with the cliff to Henry Flannery's line; thence with his line to a stone in the swag on top of the ridge; thence a straight line to a hickory and ash at the cliff." In 1921 Plowman conveyed to Henry Flannery a portion of the above tract, shown on the map as No. 2. In that deed the description was: "Beginning at a stone corner 6 feet above the pond; thence a straight

line a northeast course to a locust; thence a straight line, a north course to a hornbeam in Henry Flannery's line at edge; thence with Flannery's line to the beginning.''

In September of 1926 Flannery and wife mortgaged tract No. 3, and upon default and foreclosure the commissioner (Feb. 1935) sold the land to Kelly. In the deed the third and fourth calls were the same as in the Harris to Flannery deed. Henry Flannery had died at some date not stated, but this last transaction made Kelly the owner of tract 3, leaving title to No. 2 in the widow and heirs of Henry Flannery, in possession of the two appellants.

It was stipulated that just prior to litigation appellants began to build a fence on the portion of the land claimed by Kelly, and were giving it out in speeches that they owned the disputed strip. It was also agreed that ''one end of the line is located at the ash and hickory near the cliff and the other end at a gap of the cliff across the hill, and that said line is as described in a deed from the commissioner to Kelly.'' Further that the location of the stone in the calls of the deeds is the only point in dispute.

As we read the proof and examine the various maps, this point is within about 600 feet of the ash and hickory, and about 1,000 feet from the gap; according to Kelly it is several feet further west from the point claimed by the Flannerys. If the line is run from either the ash and hickory to the stone in the gap, thence to the gap in the cliff, or vice versa, according to Kelly, then he owns the disputed strip, if run according to the Flannerys, the line is established to their advantage.

Before answer the court appointed H. L. Leete to survey this line and report to the court. Leete was first denied permission to survey by the defendants, and later made it under a restraining order. Upon Leete's report and other proof heard, the court adjudged the true dividing line to be as found and reported by Leete as follows: ''Beginning at an ash and hickory in the line of William Plowman; thence N. 43 E. 590 feet to a stone in the gap (stone missing); thence N. 28 E. 1050 feet to a gap in the cliff,'' locating the stone corner as claimed by Kelly.

There are two maps in the transcript, one made by Leete under the court's order, the other on a survey

by Fields, whose survey showed that the line while reaching the same points, ash and hickory and gap in the cliff, veered to the east of the Leete line, several yards at some points, the result being to throw the disputed strip on the Flannery tract. At the outset we are more impressed with the proof relating to the survey made by Leete than that made by the last survey of Fields, upon whose survey appellees base their contention that their line is correct, because as they contend when he made his survey, Kelly was present and agreed that Harris should point out the line, and parties would accept it as the true line. This, as well as the location of the stone in the gap, presents conflict of testimony. Fields was employed by Kelly to survey the line. He read Kelly's deed, but said that he should have some one to show him "where the line was." Kelly brought Harris to the scene. Fields was then discussing the matter with Mrs. Flannery, who said she was willing to abide by Harris' decision. When Kelly came up Fields told him what Mrs. Flannery had said, and Kelly answered "all right." Harris then went to what appears to be the corner, "stuck a cornstalk in the ground," and said, "I am now in two or three feet of where me and Mr. Flannery drove the stake." Kelly did not agree, and Robert Flannery stepped over some 8 or 10 feet on his side and said, "I am willing for it to be put here," and Harris dug a posthole. Fields evidently used this as his starting point, and spent considerable time in getting the degree from that point to the top of the cliff. They stopped for awhile and then undertook to get a degree from the posthole to the ash and hickory, and then back to the same point. He says that Kelly assisted him in these movements, and he finally established the line as reported by him.

It was shown in evidence that in running the line Fields did not see a pond near the south end of the line near the ash and hickory. He also says he ran the line six or seven years before, and it appears from proof that it was not the same line. His line from the post back to the ash and hickory did not touch the old fence line at any point, and this is of importance because the proof shows that when Flannery owned tract No. 3 and Plowman No. 1, there had been an agreement which was carried out between them which had established the lines from the ash and hickory to a pond (on Plowman's tract), so that both would have the use of the water.

This point is some distance from the place where Harris dug his posthole. Field's line was not run with respect to deeds, or with respect to the Plowman-Flannery line from the hickory to the pond. It is on this line or corner, as fixed by Harris and claimed to have been agreed to by Kelly, that appellants stand.

Robert Flannery does not claim that Kelly ever agreed to arbitration or to the line as run by Fields from the posthole fixed by Harris, of which point he was not certain. Robert Flannery was present when Fields made his survey. He says, "Me and mother agreed that Harris could make the line. Kelly don't speak to me; he didn't talk." He did say at one time when Harris was trying to fix a starting point, not at the gap or hickory, "that's all right." Kelly emphatically denied that there was any such agreement or that he ever discussed the matter with the Flannerys looking to an arbitration of the disputed line, or agreed to the place where Harris stuck the cornstalk in the ground. He said Fields first located his instrument at post No. 2 on the map, which he insisted was the true corner. However, when he moved to the other point and set the compass further to the west, Kelly refused to have more to do with the survey. He said that Leete had surveyed the Plowman line from the hickory and ash to the pond corner, and in going toward the gap in the cliff had established a corner in the old line, where it was said the "stone in the gap" had been.

Leete had run so much of the line as divided the Harris and Plowman tract six or seven years before his survey under court order. In this survey he started from the same point in the "easily defined low gap" and then surveyed back to the hickory; then back to the low gap and placed a post in the low gap at a point where the stone was said to have been. Mrs. Kelly, daughter of Mrs. Flannery, had known the place for many years and knew the properties, and knew where the stone in the gap had been located; this she had pointed out to Leete. She said the corner had been pointed out to her by Plowman and his wife, and others, and that Leete had run his line from the hickory in a line to the low gap, following the fence between the Harris land and Plowman to that point.

The foregoing is the substance of the proof insofar as it bears on the only issue. It is apparent that the

chancellor gathered from the proof, as we have done, that the line followed by Leete from the ash and hickory to the pond was established by agreement between Plowman and Henry Flannery, who built a fence along the agreed line, and that this corner was well identified. It is just as clear that there was not satisfactorily established an agreed line between Harris and Flannery to the gap in the cliff, nor establishment and recognition of a line between Kelly and appellants.

The proof by the Flannerys to the effect that there had been an agreed line established from the stone in the gap to the gap in the cliff, is entirely too unsatisfactory to have justified the chancellor in concluding that such was the true line (Steele v. University of Kentucky, 295 Ky. 187, 174 S. W. 2d 129, and cases cited), and we agree on this point; on the whole case we are of the opinion that the chancellor correctly held the Leete line to be the correct one, and that appellants were trespassers.

Judgment affirmed; the whole court sitting.